Case No. 17-5269, Angelette's Unlimited Appellate v. United States of America. Mr. Chalos for the appellate, Ms. Murphy for the accolade. May it please the Court, Your Honors, George Chalos on behalf of Appellant Angelex. This is a case that comes to this Court as one of first impression and it is a challenge to the reasonableness of the Coast Guard's actions in detaining a vessel in the port of Norfolk back in April 2013. Almost five years to the day the vessel was released following a failed prosecution of the vessel's owner, the appellant here, Angelex, and the ship's contractual manager, a company called Cassian Maritime Navigation Agency. Now in that matter the dispute arose because the government detained the vessel in exchange for a variety of demands on the owner and the operator of the ship, which included a financial bond as well as non-financial terms. The question of whether the Coast Guard could make those demands is not before the Court. That was here in a case called Watervale and at the time this circuit, as well as the Fourth Circuit, said the Coast Guard has the authority to do these demands. But what Watervale left open, as the Fourth Circuit left open, is the question of is the action reasonable because both courts recognized that 1904H provides an after-the-fact remedy to an aggrieved owner such as the appellant in this case. Now we submit that the District Court got it wrong because the District Court said that it did not need to address the reasonableness of the terms. The District Court got it wrong because it said that the max fine of the owner and the operator is, as a matter of law, reasonable. But the District Court missed the bond, I'd say missed the boat in this case, because the only asset, what we're talking about, is the ship and the only ownership interest in the ship belongs to Angel X. Can we go back a moment? In assessing the reasonableness of what the Coast Guard insisted upon, don't we have to look at what the record shows us as to what the boat owners presented to the Coast Guard? I agree, Your Honor. And what do we have in the record supporting the claim of an indebtedness which engulfed the value of the ship itself? The Coast Guard at the time, when this matter was pending before the Eastern District of Virginia, before Judge Dumar, the Coast Guard asked for and were provided financials of the ship owner, Angel X. No, the question is, are any of those in the record of this case? Sure, absolutely. They are? Absolutely. In fact, part of our gripe with the District Court's decision is... Where in the record? Where are they? It's from the District Court case, it's from the administrative record, it's from all those things which... Can you point us to their joint appendix site? We weren't able to find them. I don't believe it was included in the joint appendix, but it was certainly evidence, and is evidence, before the court in the District Court. The District Court didn't think so. Yeah, that's one of the errors the District Court made. The District Court also said that as far as it was concerned, the question of... What exactly was provided when you say the financials? There were... I don't remember the details, I know for sure it was unaudited financial statements, balance sheets, profit and loss... There were some emails describing what the financial statements would say. No, the emails, Your Honor, were a description of the vessel's mortgage indebtedness. There is a mortgage that was recorded in the Coast Guard... Would you agree that if these financial statements are not in the record, that that's fatal to your argument here? I don't agree, Your Honor, because we would have presented testimonial evidence at trial for the owner of the ship and representatives of the owner of the ship who would have come in and testified. Now, the government can't take advantage of the fact that it didn't call any witnesses for deposition. We identified at least eight witnesses, we identified documents and subjects that they would have testified about. I mean, the Coast Guard identified... You had a duty to come forward with evidence of factual disputes at the summary judgment stage, did you not? Yes, we do, of course we do. And so the admissible evidence that you came forward with was what? The administrative record that was before the court in the Eastern District of Virginia and the Fourth Circuit and all which would have been... That's awfully vague and vague. Is there anything more specific? On the topic of financials or inability, there certainly would have been evidence as to the company's financial position. There would have been the charter party, which would explain what the vessel's earning capacity was. There was the mortgage indebtedness, which is a matter of public record. It can be found through the vessel's flag state registry. And there would have been testimonial evidence from representatives of the shipowner who would have come in and explained very clearly that the ship was upside down. And by not being able to trade, it was almost a near death for the company. You say in your brief that the district court erred because there are several disputed issues of material fact. That's right. But as I look at those, all the ones that you list are about process. Who actually made the decision, what they actually considered, what they were thinking. But why is that relevant? The question is whether the agency's action was reasonable. And I don't see anything in the statute that imposes any process requirements. It's just objective reasonableness. So why are any of those even relevant? Right. So the statute talks to an unreasonable delay. Right. And so I agree that the statute and the regs don't provide a process which the Coast Guard must follow. In fact, I would agree with the government that the statute generally defers to the Coast Guard on what process that they would use. But where I disagree with the government in this regard is that 1904H, after the fact remedy, is the safeguard or backstop, if you will, that the processes, or however you would say it in the plural, that are employed must be reasonable. Wait, wait. I lost you there. I was with you up until your last sentence. Yeah. I thought at the beginning that you and I were in agreement that the statute doesn't impose any process. No specific or expressed process. Correct. Right. So now how do you get to getting process back in? So 1904H provides a standard for which the decision-making process must follow. And that standard is one of reasonableness. And it would be unreasonable, and that's the way the statute is written in terms of unreasonable, it would be unreasonable not to look at the totality of the circumstances. And we point out specific incidents where the government or Coast Guard, in this case, put their head in the sand and did not do things that would have been reasonable, such as they asked for financials, they did no analysis. They imposed a maximum fine as their calculation, but they did it for both the vessel owner, Angel X, and the non-party who has no ownership or equity interest in the vessel. So that's unreasonable because there's no in-rem right or quasi-in-rem right against the vessel for any fine or penalty that might be imposed against the operator or an individual or anybody else. It's the property of Angel X and only Angel X. At what point in time are we supposed to measure the reasonableness of the government's actions in delaying the ship? Do we, under 1904H, use sort of 20-20 hindsight, or do we look back at the time they made the decisions to impose the bond that they did and say, given the information they had and the information they didn't have, was it reasonable? Which time frame do we use? In this case, I think it's a distinction. Not in this case, under the statute, under 1904H. In all cases, what time frame do we use? Yeah. So I think that it has to be a contemporaneous snapshot and follow the evolution of the case. In this matter, I think that the question of whether it's 20-20 hindsight or doing that process that we just spoke about is a distinction without a difference. The Coast Guard did not – So you agree that we – when you say contemporaneous, you mean at the time they actually made the decision, the decision to impose the bond and the amount of the bond. Right. But, Your Honor, our complaint goes beyond that. It's not a snapshot of when they took the decision. It's the failure to continue to reassess the decision throughout the nearly six months that the vessel sat. Is the government allowed at this sort of pre-prosecution stage to disbelieve evidence that's submitted by the ship owner? I think they are, but there's no dispute that the only company that has an ownership or equitable interest in the Antonis G. Papadakis vessel was Angel X. Yes, but could they disagree about – put it in a hypothetical case, not this one. Could they disagree with the ship owner's assertions of innocence or lack of knowledge or lack of affiliation with someone else's bad activities? In another case, could they disagree? If differing minds could reasonably agree to disagree, yeah. But, again, the standard is reasonable. Your Honor, I know my time is up, but I'd like to point the panel to joint appendix at page 390. And what's important about that is that's the captain of the port, Captain John Little's testimony. And he, by DOJ designation and by admission of other Coast Guard, more senior Coast Guard representatives, said that Captain Little was the individual with the authority to decide what's satisfactory and unsatisfactory, what's reasonable and what's unreasonable. And Little himself testified, and you find it in joint appendix 390, that the bond conditions that Judge Dumas imposed, the $1.5 million bond, which is the equivalent of the maximum fine against the ship owner, was reasonable. He says it was not unsatisfactory to him. So if he is the individual tasked with the authority to decide what's reasonable and what's unreasonable, what's satisfactory and what's unsatisfactory, and he says that $1.5 million on the financial terms was a reasonable, satisfactory figure, plus other things, which we haven't spoken about in this argument, isn't it unreasonable to demand something more than that? When the man with the authority, supposedly, His decision was reversed by the Fourth Circuit. I'm sorry, Your Honor. His decision was reversed by the Fourth Circuit. It wasn't reversed. It was basically vacated on the fine. Vacated. That he didn't have subject matter jurisdiction because of the 19-0. So if he had no subject matter jurisdiction, he had no authority to make any determination with respect to the reasonableness of this. That may be right. He was without jurisdiction. That may be right, but it doesn't mean he was wrong. Let me ask you a slightly unrelated question with respect to the non-monetary provisions. Yes, sir. Am I right? Do I read this record correctly that at the time Judge, what's his name? Dumont. Dumont made his decision. Your client didn't object to any of the non-monetary. Angel X agreed. The owner of the ship agreed. Well, that's the only party before us here, right? That's correct. Okay, so then how under this statute can you challenge it? Because obviously the actions of the agency didn't cause any lawsuit. No, it did, Your Honor, and I'll explain why. Because you're talking about one pile of money, and the money can be paid to you. It can be paid in part to Judge Williams. It can be paid in part to Judge Millet. But I can't give it all to you and still give a little bit to the other judges. So in this circumstance, when you lump it all together, it was too much. With the reduced bond, which had to be secured dollar for dollar, the company was able to loan. But didn't the district court find that your client stated that even without the non-monetary conditions, they could not supply the bond? That's right. That's 100% correct. But the point is— Well, doesn't that resolve that point then? It does not because— Your client is on record saying even without the non-monetary conditions, it could not have satisfied the bond. No, that misses the point completely, and I'll explain why if I may. Sure. Willing to agree to something when the gun is against your head is very different than making it reasonable. The test isn't whether you can beg, borrow, and steal and make this deal to get your ship back in service. What it says here is that our client was working very hard to meet the government's demands because it was facing almost assured extinction if they didn't. They went out, and the record would show, if we had more of an opportunity to develop the factual record, that they secured lending to put up the bond, and they secured funding to cover the expenses, which largely would have come from the ship's continual trade. It would have been basically a little bit behind, but as they would have earned monies and fees from the ship trading, they would have been able to cover the housing, the hotels, the costs, and et cetera and so forth. But without getting the ship into service, without getting a bond that was reachable, without being able to earn future income, the whole deal fell apart. So it's incorrect to look at them as two separate and distinct obligations. If it was good enough under this circumstance, it would be good enough under that circumstance. That goes one step too far and misstates what the contemporaneous facts were at the time. Thank you. Thank you. We'll hear from the government. May it please the Court, Anne Murphy for the United States. Your Honor, I'd like, if I might, to just describe the statutory scheme a little bit, and that will explain why Cassian. It was also reasonable for the government to demand a bond that would include money that represents Cassian's potential liability. Under Section 1908E, the government has to refuse or rebuke the vessel's clearance if there's reasonable cause to believe that the pollution laws were violated. And this court in Waterville recognized that under the statutes, the government can simply hold the ship until the criminal proceedings are completed. That's reasonable, and I don't believe that it's disputed. It's also undisputed that here it was reasonable for the government to initially withhold the clearance. So as the district court recognized here, when you get to the part where the secretary may grant clearance, it doesn't, he or she doesn't have to, but may grant clearance, the government's entitled to a set of conditions that put the government in a no worse position than it would be in if it had kept the vessel. Do you accept the idea that that's subject to review for reasonableness? We do accept that in the separate subsequent action it is subject to review for reasonableness, yes, Your Honor. So as the district court recognized, any condition that makes the agreement an effective substitute for the presence of the vessel is going to be reasonable. And here, Cassian's liability is clear just from the statute. Under Subsection A, it makes it a criminal penalty for a person to violate MARPOL. Subsection E, you can withhold clearance if the vessel's owner, operator, or person in charge is liable. And then the liability in REM precision makes the ship liable for any fine imposed without regard to whether it's against the owner, the operator, or anyone else. So how do we review the satisfactory-to-the-Secretary decision under 1908, later under 1904H? How are we supposed to determine whether in any given case the decision either not to grant a bond at all or to grant a bond that was too large for them to meet is unreasonable? How would that ever be reviewed? I think you have to look at the statutory scheme. You have to look at the Secretary's interest in prosecuting the vessel. And to the extent that it's within the Secretary's discretion, that the Coast Guard acted within its discretion, I think that's going to be reasonable. What would be an example of an unreasonable? What would be outside the discretion, since you say they don't have to give a bond at all? Well, let's say that in this case the owner and the operator had said, okay, you caught us. We were polluting. We are willing to put out the full amount of all of the criminal penalties and agree to the non-financial conditions. And the Secretary said, I've changed my mind. I don't think I'm going to let you go. You veer into a point that struck me about the district court opinion, and that was the idea that the maximum chargeable fines were ifso facto reasonable. But we know that Congress often sets penalties way in excess of what it expects judges or other authorities to levy. And so it seems to me a stretch to think that any fine specified in the statute automatically represents the floor for reasonableness. Well, Your Honor, a couple of points on that. First of all, the bond and the penalty and the maximum fine also involve charging discretion by the Coast Guard. So, for example, here, the Papadakis. Yes, but suppose it's plain, someone, the Coast Guard, looking at all the facts then available to it, can see that this is a case that is not going to produce the maximum fine, right? But, Your Honor, at the time that the decision's being made. I'm talking about at the time. Right. At the time, nobody knows how the criminal trial is going to progress. I mean, at the time the initial decision was made, there was only one violation charged, and events kind of moved. You're going beyond the district judge. You're suggesting that all kinds of additional charges might develop, presumably, with all kinds of new maximums. But what's relevant, Your Honor, is at the time that the discussions over the bond amount are going on, I think the district court was absolutely right. At that time, nobody knows what the conviction's going to look like, or even if there's going to be a conviction. Because, remember, the point is to leave a substitute for the presence of the vessel. The government needn't be any worse off than it would be if it had the ship, and it can, you know. Well, is there any duty to revisit that judgment as you get, as facts develop? Imagine you set the bond, and then as you investigate, it turns out the ship was hijacked, and it was the pirates who were dumping the gunk into the sea. Do we still just look back, as you said, at the time of the initial decision? No, Your Honor. Well, how often do we revisit? I mean, how do we assess the reasonableness of this whole thing? Well, eventually, there's either going to be a security agreement, or we're going to keep the vessel. So here, it's a little bit difficult to assess because there was never actually final office. The negotiations were still ongoing when Angelix's counsel went to court and started litigation in the Fourth Circuit. And then after the Fourth Circuit made its decision, there was another effort by the government to reach out to Angelix, and that's at JA-418, to see if we could have another negotiation. So at any point, there's going to be some doubt, perhaps, if there's no security agreement is reached about quite what the offers were. So I think all you can do at this point is, since the vessel didn't leave, and the question is, was it reasonable for the Coast Guard to keep it, is to look at that set of circumstances in this case. So your test of reasonableness is, as long as it leaves the government in the same position, it would be if the ship were there. Correct. Which then has no adjustment for overcharging penalties that are way higher than anybody really thinks they're ever going to seek, let alone recover. As long as they charge it up high, they're good. But that's not clear. I mean, it's not clear that that's what happened. I'm asking about your legal test for unreasonableness, and that keeping them in the same position as if the boat were there sort of is going to insulate you from everything. What the district court said was, you need something objective that you can tell right at the beginning. Because don't forget, these are normally taking place really over hours and days, because the ship wants to go on its way, and the government wants to protect its interest in prosecuting the crimes. So I'd also like to add, this is the only case that we're aware of in which there was an inability to reach an agreement. I'm just trying to understand what the test for unreasonable delay is, when the unreasonableness is trying to measure whether something was reasonably satisfactory to the secretary at some prior time. And as you said, I get that up front, in the first immediate moments, it might be hard. But you agreed that you don't just stop, and that you have to reevaluate the reasonableness of the bond over time as the investigation develops. So what is the test? But I think just the facts of what's going to happen here is, either there will be a security agreement or there won't. So say, for example, we'd held the vessel, and facts came to light that showed that Angelix was not going to be a viable defendant, but Cassian would. Then the reasonableness of asking for a bond to secure financial penalties against Cassian would go away, or Angelix, whichever. So then you'd need to negotiate on the basis of the lower amount. But how are courts supposed to do this after the fact? Because what will happen is they'll say, hey, we gave you evidence that we were innocent, and the government will go, well, we didn't know, we were still investigating, and nothing's going to be certain enough to keep the government in the same position it would be as if the ship were there, until things are actually proved at trial, are they? Well, I mean, I think that's why the district court said we know the government can keep the ship, so it's reasonable for the government not to put itself in a worse position. But we don't know the government can reasonably keep the ship, do we? Yes, we do. I think we know that just from the statute, because the statute says that the government has to revoke the clearance. That's not even optional for the Secretary. We know that the government may give the departure clearance, and we know from Waterville that there's very broad discretion over that. And the other thing to notice is that we know that after the fact, we can evaluate the reasonableness of that decision not to give a bond. Are you saying, it sounds like your argument that we don't, that you can always keep the ship. We can always keep the ship. Then would by nature mean that any bond will always be reasonable, because it'll be less than keeping the ship, it'll be better than keeping the ship? It doesn't mean that any bond will be reasonable, but the district court was correct, that any bond up to the amount of the maximum penalties is going to be reasonable. And the reason we know we can keep the ship here on it is because under Section 1908D, it provides for liability and REM for the fine imposed. And by the time the fine's imposed, there's been a criminal trial, and the statute presupposes that the vessel is still there. So I think the district court is just correct that we can keep the vessel. The statute requires us to at least keep the ship for an amount of time. And if we can't come to terms, then it is reasonable for the government to protect its entire interest. I'm just trying to understand how Congress could have had a statutory provision for unreasonable delay or detention, unreasonable detention, if, under your theory, detention is inherently allowed and reasonable. Well, I assume that there's no issue about the detention in this case, but I'm assuming that a ship could come in and say, you should never have detained me because there was no MARPOL violation. That's not an issue in this case. And the reason that the statute is in here, I can't actually answer that question, it's a requirement of MARPOL, I believe it's Article 7, that one of the things that the country's legislation has to have is a remedy for unreasonable detention or delay. You said, in response to a question, that this was the only case where the parties weren't able to reach an agreement? Correct. Is that in the record? Is that information in the record? How many such cases are there, and besides, what difference does that make in this case? I don't think it's in the record, but it seems like I would have to ask the Coast Guard. Do you know how many cases like this? Do you know how many times ships are prevented from departing and bonds negotiated? I know it's a significant number, and the closest thing I have is the testimony of Commander Grant. It's around page 416, where he had negotiated seven with them, and we did put a footnote in our brief trying to address this issue of how many cases there are. Suppose you're right that this is the only one, and that there are many. Does that make any difference in how we dispose of this case? I think it should comfort your honors that generally it is a reasonable process, that generally the government acts reasonably, vessels are willing to put up the money. They don't say things like, oh, I'm not giving you any information from the operator because you can't reach its assets. All right. Okay. Thank you. Thank you, Your Honor. Thank you. Did counsel have any time left? You can take a minute, Your Honor. Your Honors, the bond demand and the other terms beyond the financial terms don't put the government or the Coast Guard in the same position as if the ship sat there. If the ship sat there, the ship only answers for the fine against its owner, Angel X. It doesn't create personal jurisdiction over a foreign manager or an operator. The Second Circuit case law, which we cited, the Caitlin case with the vessel called the Angel N, that makes clear that that doesn't create, there is no jurisdiction over a foreign ship manager or operator. There was no continuing investigation. Not one single Coast Guard or DOJ employee went to the vessel after about the 19th of April, so the ship sat another five months plus. Why is that relevant? Because the government's contention is that the vessel sitting there, and the bond, financial and non-financial terms, put the government in the same position as if the vessel sat there. What I'm arguing is it doesn't at all. It puts the government in a better position. By sitting there, the vessel doesn't require records custodians that come from foreign offices. It doesn't require either the owner or the manager to pay for it. Again, Your Honor, this court, the Circuit Court, wrote in the border bail that if the government asserts in the appellant's degree that the financial terms of a bond referred to in the act cover the ultimate liability of a ship owner, here the government's asking for the ultimate liability of a ship owner and somebody else. You don't need to do a very complicated mathematical analysis or forensic accounting. What about if in a different case the government's theory was that the ship owner hired the operator, put the operator up to this. This is all part of their conspiracy together. And again, in a different case, they're both convicted. Can the government then, at the end of the criminal trial, seize the ship? Not the ship. The government can certainly seize it. Assuming there's an unpaid fine by the operator, there are other means available to the government to seize assets in the traditional way. They can't use the ship as an asset. No, Your Honor. I'd like to leave the court, if I may, with just a few rhetorical questions that frame the issue. You need to finish up. You have one minute. You don't have time for a few rhetorical suggestions. Okay. How is it reasonable to hold the ship and say that it's necessary for the prosecution if no one goes to the ship? All the witnesses are off. How is it reasonable to hold the ship as security for a fine when there's no equity in the vessel because of the mortgage, which by black-letter U.S. maritime law trumps any claim the government may have? All right. Thank you very much. The case is submitted.
judges: Tatel, Millett, Williams